## CALLAWAY et ux. v. SNEAD.

No. 3933.

Court of Civil Appeals of Texas. Texarkana.

Dec. 14, 1930.

Rehearing Denied Dec. 18, 1930.

B. F. Gafford and J. P. Cox, both of Sherman, for appellants.

Geo. Hines, of Sherman, and Webster Atwell, of Dallas, for appellee.

HODGES, J.

In December, 1926, J. W. Callaway and wife executed a deed conveying to the appellee Snead fifty acres of land in Grayson county and four lots in the town of Howe. The deed was in the form of an absolute conveyance and recited a cash consideration of $10,000. In August, 1928, Callaway and wife filed this suit to cancel that deed. They alleged as a ground for cancellation that the farm land described in the deed was at the time a part of their homestead and that the deed was intended to operate as a mortgage of that property to secure a debt; that no part of the consideration recited in the deed had ever been received by them.

The substance of the facts alleged by the plaintiffs, briefly stated, are as follows: At the time the deed was executed and prior thereto, Snead was an officer and director of the State Trust & Savings Company of Dallas, and Callaway was a director of the Home State Bank of Howe. The Howe bank was indebted to the Dallas bank for loans previously made amounting to about $43,000. After several conferences between Snead and the directors of the Howe bank, Snead agreed that if those directors would convey their lands to him he would have the State Trust & Savings Bank of Dallas give the Home State Bank of Howe credit for the various considerations expressed in the deeds and that the Dallas bank would furnish the money necessary to enable the Howe bank to continue operation, and would not permit that bank to fail; that the directors of the Howe bank could redeem their properties within two years from the date of the deeds. They further alleged that Mrs. Callaway, the wife of J. W. Callaway, signed the deed but never appeared before a notary public and acknowledged the same privily and apart from her husband or otherwise; that the notary did not explain the instrument to her; and that she never had declared to the notary that she willingly signed the deed and did not wish to retract it. They also alleged that what appeared to be her acknowledg-

ment was false; that when she signed the deed she did not know it purported to convey or mortgage any part of her homestead.

Snead answered by general denial, and further pleaded that the deed was intended to be an absolute conveyance of the property; that the sale was bona fide and the consideration had been paid in cash. It is not necessary to further notice the pleadings of the parties in order to determine the issues to be discussed.

A jury was impaneled to try the case, but at the conclusion of the testimony the court instructed a verdict in favor of the appellee Snead.

In this appeal it is contended that the evidence made an issue as to whether or not the deed was a mortgage or an absolute conveyance which should have been submitted to the jury.

The following excerpt from the testimony of J. M. Howdeshell, one of the directors of the Howe bank and a witness for the plaintiffs, presents the material evidence upon which the appellants relied:

"I remember about some transactions had by the directors of the Home State Bank of Howe with E. O. Snead of Dallas. Along at that time I was president of the Home State Bank. As such officer I had meetings of the directors of the Home State Bank of Howe with Mr. Snead of Dallas. I recollect three of such meetings outside of the meeting room. Two meetings were held at my home in Sherman, and one at the Trust & Savings Bank at Dallas. At the meeting at my home in Sherman in December, 1926, Mr. Snead proposed to the directors in a body at my house that he would furnish $100.00 an acre on this land and he would take a repurchase agreement, and give them the preference or privilege of taking it up in two years. The directors conferred with Mr. Snead, and their information was that Mr. Snead thought it was the best plan by which the board could take care of the obligation at the Dallas Bank."

"Mr. Snead further said that he would take care of the Home State Bank and not let it go under, take care of their obligation, if we would do that, he would guarantee that the Home State Bank would get on a good safe basis. He wanted a deed to the land and he would furnish them as much as $100.00 per acre. We talked to Mr. Snead about deeding away our homesteads, that it was against the law to do that, we could not do that. Mr. Snead suggested that it would be all right in this instance, we would have a chance to take care of the obligation, and we could deed our lands for the purpose of securing the money, I can't remember the whole transaction word for word. The sense of it was that he was to furnish this as a loan to the directors, and that they would deed their

homesteads for the sum of about $42,000.00. I was about the heaviest man in the bunch. The deeds were made to secure money to keep the bank open. He guaranteed that he would keep it open unless they made a run on the bank. Mr. Snead was to furnish a repurchase agreement in exchange for the deeds, a privilege of taking it up inside of two years. The deed involved in this case was executed December 10th, 1926, and the bank was closed August 22, 1927. I don't remember that Mr. Snead said who was to furnish the money. At that time our bank was indebted to the State Trust and Savings Bank of Dallas, Texas, and at that time Mr. Snead was an officer in that bank. At that time the State Trust and Savings Bank of Dallas had notes which had been made to the Home State Bank and transferred to it. The State Trust and Savings Bank required $150.00 for every $100.00 it advanced. Mr. Snead stated that if the Home State Bank wanted further money the State Trust and Savings Bank would be glad to furnish it as well as take care of the obligation. In furnishing that money he would see that the Home State Bank at Howe would be restored to good condition and kept in first class shape. He did not carry out that agreement. There was nothing said by Mr. Snead to me or to the other directors, as far as I know, about renting the lands. In making the conveyance, Mr. Snead offered $100.00 an acre as a loan, as I understood it. I could not answer what became of or was done with the money that was paid on the transaction with the plaintiff, J. W. Callaway. Mr. Snead said that the money, when we conveyed the land, would be used for the purpose of taking up notes out of the bank or take care of its Dallas obligations to carry it over to go on another season. There were depressed conditions at that time. There were individual notes in the bank taken by the bank from individual farmers and people in the surrounding country, and he said we could take this money and pay up these notes, and help the bank go on through another year, and it could be used for that purpose, principally that purpose and pay this obligation at the Dallas Bank."

"If I remember correctly, in the meetings of the directors when they conferred with Mr. Snead, I stated to Mr. Snead that we could not deed away our homesteads for the benefit of the bank on outside obligations, and he said we could make repurchase agreements and borrow money on it. I think that is word for word almost."

Callaway testified that he did not attend any of the conferences between Snead and the other directors of the Howe bank. He talked with the other directors, who told him what Snead had proposed, and it was upon that information that he concluded to make the conveyance evidenced by this deed. He further testified that he left the deed at the Howe bank and it was delivered to Snead by some of the officers of the bank. After the delivery of the deed, he received the following letter from Snead.

"December 11, 1926.

"Mr. H. W. Callaway,
"Howe, Texas.

"Dear Sir:

"This is to advise you that I have this day given you exclusive agency for the sale of the following described property for a period of two years from this date under the following terms and conditions. (Here follows a description of the property contained in the deed).

"The consideration for the above described properties to be $10,000.00 plus 6% interest from this date to date of sale, plus any taxes to be paid by me from now to date of sale, less any rents or revenues received from said properties.

"Your commission in this matter to be all over and above price or consideration.

"Yours truly, [Signed] E. O. Snead."

On cross-examination, Callaway testified that when the notary went to his house, he (Callaway) told his wife that there were some papers to sign and she said, "These are the papers I said I would not sign." She had said to him in a previous talk on the subject. He had told her what the paper was going to be and what it was. He told her before that time that he thought it was all right, but did not repeat that the evening she signed, but that was his opinion. Herbert Howdeshell was the notary who took her acknowledgment. Both he and his wife signed the deed before the notary. He did not know what was done with the deed after it was carried back to the bank; he never saw it any more. He testified: "I got a deposit slip for the execution of that deed; I did not get a check. You show me a paper which purports to be a check from E. O. Snead payable to J. W. Callaway. That is my signature but I don't remember it. I remember the deposit slip but I don't remember the check. You show me now the warranty deed from J. W. Callaway and Ida F. Callaway to E. O. Snead; that is my signature to that instrument. I say that the back of the check you show me is mine. There was a deposit slip, the money was put to my credit, but I don't remember the check—that $10,000.00 was placed to my credit in the Home State Bank of Howe." The witness further testified: "I don't remember what became of the balance of the money, I put it in the bank, I don't know that I used it. When the Howe State Bank closed, I had on deposit to my credit between $1,400.00 and $1,500.00; I had spent around $7,000.00 or $8,000.00 of the

$10,000.00 in six or seven months after the deed was executed. You ask if that was not used by me and my wife and sons, I can't say as to that, I may have given some checks." Again he said: "Mr. Snead did not personally give me the letter which has been introduced in evidence, but I got it. He sent it to me. I did not personally give him the deed, I left the deed at the Howe bank. The deed and the letter are the only papers written about the transaction that I know of. I did not have a verbal contract with Mr. Snead, I never talked with Mr. Snead in my life." On redirect examination he said: "I never had any agreement with Mr. Snead about the $10,000.00, I never had any agreement whatever with Mr. Snead; I never talked with him in my life."

Mrs. Callaway testified in substance that the deed was presented to her and that she signed it in the presence of the notary and her husband. She had previously told her husband that she was willing to sign the deed if he thought it was best. That she was willing to do whatever he thought was best.

The check for $10,000, payable to Callaway and signed by Snead, was introduced in evidence. A photostatic copy of the books of the bank introduced in evidence showed that $10,000 on or about the date the check was given had been deposited to the credit of J. W. Callaway. That record also showed that most of the money had been paid out on checks signed by Callaway or by his authority.

We think it conclusively appeared that the money was received by Callaway and was used for his own benefit and that of other members of his family.

The deed from Callaway and wife to Snead was also introduced in evidence and expressed a cash consideration of $10,000. It purported to be an absolute conveyance of the property and contained a general warranty of the title. The certificate of the notary who took the acknowledgments of Callaway and wife was in the form required by law.

In cases of this character, the party who undertakes to ingraft a parol trust on a deed absolute in form has the burden of proving all the essential facts upon which he must rely, and the evidence must be clear and convincing. Miller v. Yturria, 69 Tex. 549, 7 S.W. 206; Gazley v. Herring (Tex. Sup.) 17 S. W. 17; Howard v. Zimpelman (Tex. Sup.) 14 S.W. 59.

In order to justify construing a deed absolute in form as a mortgage, it must be shown that there was a debt the mortgage was intended to secure. Such an instrument will never be construed as a mortgage unless the relation of debtor and creditor exists between the parties. Miller v. Yturria, 69 Tex. 549, 7 S. W. 206; Rotan Grocery Co. v. Turner, 46 Tex. Civ. App. 534, 102 S. W. 932; Loving v. Milliken, 59 Tex. 423; Astugueville v. Loustaunau, 61 Tex. 233; Gray v. Shelby, 83 Tex. 405, 18 S.W. 809.

To constitute the relation of debtor and creditor it must appear that there was a right of action by the vendee against the apparent vendor for money which formed the consideration for the conveyance. Calhoun v. Lumpkin, 60 Tex. 185, 189; McCamant v. Roberts, 80 Tex. 316, 15 S. W. 580, 1054.

There is no evidence in this case that after this deed was delivered to Snead there was any obligation on the part of Callaway to repay any part of the consideration he received from Snead for the land. The most that Callaway can claim is that he had a right to repurchase the land upon the terms stated in the letter he received from Snead. A contract of that character cannot be construed as a mortgage if the transaction is bona fide and not designed as a mere evasion of the law against mortgaging the homestead. (See cases referred to.)

Snead and Callaway never had any personal negotiations or agreement except those evidenced by the deed, check, and the letter. Certainly there is no evidence that Callaway bound himself in any manner to repay the money he received from Snead. There was no promise, express or implied, upon which Snead could maintain a suit against Callaway for a recovery of the money. Snead testified that the transaction was one of purchase and sale; that he bought the property and paid the full price; and that he had no claim whatever against Callaway for repayment of the money.

We think the trial court was correct in concluding that there was not sufficient evidence to support a finding that the deed in controversy was a mortgage.

It is also contended by appellants that the notary who took the acknowledgment of Mrs. Callaway did not comply with the statutory requirements for taking the acknowledgment of a married woman. The evidence conclusively shows that Mrs. Callaway did appear before the notary and acknowledged that she willingly signed the deed. That being true, the certificate of the notary, which is in proper form, is conclusive that the law was complied with in the absence of evidence that the failure of the notary to make the necessary explanations and ask the necessary questions was known to the grantee. Adkins-Polk Co. v. Rhodes (Tex. Com. App.) 24 S.W.(2d) 351; Lummus v. Alma State Bank (Tex. Civ. App.) 4 S.W.(2d) 195, and cases there cited. There is no evidence in this case that Snead knew anything of what occurred between the notary and Mrs. Callaway at the

time her acknowledgment was taken. It further appears that he paid value for the land.

We therefore conclude that the judgment should be affirmed, and it is so ordered.